Slip Op. 09-46

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Nicholas Tsoucalas, Senior Judge**

_____ :
                                    :
LONGKOU HAIMENG MACHINERY CO., LTD., :
LAIZHOU AUTO BRAKE EQUIPMENT COMPANY, :
LAIZHOU HONGDA AUTO REPLACEMENT     :
PARTS CO., LTD.,                    :
LAIZHOU LUQI MACHINERY CO., LTD.,   :
QINGDAO GREN (GROUP) CO., and       :
LONGKOU TLC MACHINERY CO., LTD.,    :
                                    :
          Plaintiffs,               :
                                    :
     v.                             : Consolidated
                                    : Court No. 07-00321
United States,                      :
                                    :
          Defendant,                :
                                    :
          and                       :
                                    :
COALITION FOR THE PRESERVATION OF   :
AMERICAN BRAKE DRUM AND ROTOR       :
AFTERMARKET MANUFACTURERS,          :
                                    :
          Defendant-Intervenor.     :
_____ :


## OPINION

**Held:** The Court affirms, in its entirety, the United States
Department of Commerce's Final Results of Redetermination Pursuant
to Court Remand (Feb. 18, 2009).

                                        Dated: May 18, 2009


<u>Trade Pacific PLLC</u>, (<u>Robert G. Gosselink</u>; <u>Jonathan Michael Freed</u>)
for Longkou Haimeng Machinery Co., Ltd.; Laizhou Auto Brake
Equipment Company; Laizhou Hongda Auto Replacement Parts Co., Ltd.;
Laizhou Luqi Machinery Co., Ltd.; and Qingdao Gren (Group) Co.,
Plaintiffs.

<u>Venable LLP</u>, (<u>Lindsay Beardsworth Meyer</u>) for Longkou TLC Machinery
Co., Ltd., Plaintiff.

<u>Michael F. Hertz</u>, Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice; <u>Jeanne E. Davidson</u>, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; <u>Patricia M. McCarthy</u>; Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Courtney E. Sheehan</u> and <u>Stephen C. Tosini</u>); <u>Evangeline D. Keenan</u>, Office of Chief Counsel for Import Administration, United States Department of Commerce, for the United States, Defendant.

<u>Porter, Wright, Morris & Arthur, LLP</u>, (<u>Leslie A. Glick</u>) for The Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers, Defendant-Intervenor.

**Tsoucalas, Senior Judge:** This matter comes before the Court following its decision in <u>Longkou Haimeng Mach. Co., Ltd. v. United States</u> ("<u>Longkou</u>"), 32 CIT __, 581 F. Supp. 2d 1344 (2008), in which the Court remanded the administrative determination in <u>Brake Rotors From the People's Republic of China: Final Results of Antidumping Duty Administrative and New Shipper Reviews and Partial Rescission of the 2005-2006 Administrative Review</u>, 72 Fed. Reg. 42,386 (Aug. 2, 2007) ("<u>Final Results</u>") to the United States Department of Commerce, International Trade Administration ("Commerce" or "Department"). <u>Longkou</u> arose from Plaintiffs' challenge to Commerce's <u>Final Results</u>, and ensuing motion for judgment on the agency record under USCIT Rule 56.2. In their motion, Plaintiffs alleged, <u>inter alia</u>, that Commerce failed to adhere to the statutory requirement to value factors of production using the best available information. Because Commerce valued pig iron using Indian import data, despite record evidence indicating

that the imported pig iron (Sorelmetal) was not specific to the pig iron used by Plaintiffs, the Department's valuation of this input was not based on the best available information.  In Longkou, the Court instructed Commerce to specifically address: (1) whether Sorelmetal is fundamentally different from the pig iron consumed by respondents and cannot be used in the production of subject brake rotors; or alternately (2) whether pig iron imports into India under HTS 7201.1000 are the best available information for valuing the pig iron consumed by Plaintiffs in the production of subject brake rotors.  See Longkou, 32 CIT at __, 581 F. Supp. 2d 1344, 1364.  The Court now reviews the Final Results of Redetermination Pursuant to Court Remand (Feb. 18, 2009) ("Final Remand Redetermination"), in which the surrogate value for pig iron, and hence Plaintiffs' margin, remains unchanged from the Final Results.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c).

## STANDARD OF REVIEW

The Court reviews the agency's redetermination pursuant to the Court's remand under the substantial evidence and in accordance with law standard, which is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i) (2000) ("The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law . . . .”).  Substantial evidence is “‘such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.’” Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  “Substantial evidence requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence.” Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citations and quotation marks omitted).  The existence of substantial evidence is determined “by considering the record as a whole, including evidence that supports as well as evidence that ‘fairly detracts from the substantiality of the evidence.’” Huaiyin, 322 F.3d at 1374 (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The Court “must affirm [Commerce’s] determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the [Department’s] conclusion.” Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citations and quotation marks omitted).

## BACKGROUND

The Court presumes familiarity with its decision in Longkou, which provides background discussion on the less-than-fair-value determination that Plaintiffs contest in this judicial proceeding. See Longkou, 32 CIT __, 581 F. Supp. 2d 1344.  Below, the Court

provides additional background information specific to the Final Remand Redetermination now before the Court.

In making the determination of whether imported merchandise is being sold at less-than-fair-value in the United States, Commerce must first quantify the term "normal value."  Whereas normal value typically equals the domestic price of the product in the exporting country, see 19 U.S.C. § 1677b(a)(1), if the exporting country is a non-market economy ("NME"), domestic sales of subject merchandise may not be a reliable indicator of market value, see id. § 1677b(c)(1).  In such instances, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expense." Id.  Section 1677b(c)(1) further provides that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  Id.

In the Final Results, Commerce calculated the value of each input in the production process, using information from a market economy surrogate country.[1]  The Department rejected alternative

---

[1] Commerce relied on publicly available Indian surrogate values for each input. With respect to pig iron, the agency used

data submitted by Plaintiffs which included the financial statements of Indian Steel producer, Steel Authority of India Limited ("SAIL").  See Def.'s Resp. in Opp'n to Pls.' Mot. J. Upon the Agency R. ("Def.'s Brief") at 28.  Plaintiffs contested the Department's refusal to consider this alternative data, and argued that its reliance on what Plaintiffs consider less representative data to value pig iron, was unsupported by substantial evidence. See Mem. of P. & A. in Supp. of Pls.' Mot. J. Upon the Agency R. ("Pls.' Brief") at 26.  Specifically, Plaintiffs pointed to record evidence indicating that "approximately seventy percent of the pig iron imported into India during the POR was Sorelmetal."[2]  Id. at 25.  Sorelmetal, Plaintiffs argued, is a high-purity ductile iron that is dissimilar to the type of pig iron consumed by Plaintiffs in the production of subject merchandise.  See id.  Therefore, Plaintiffs concluded, the data Commerce relied on did not constitute the best available information for valuing pig iron.  In defense of its position, Commerce pointed to the fact that the imports comprised primarily of Sorelmetal had the same range of average unit values ("AUVs") as those pig iron imports from the other six countries recorded in the WTA, and that "the respondents

Indian import statistics obtained from the World Trade Atlas ("WTA"), a published data source that tracks global imports and exports. See Longkou, 581. F. Supp. 2d at 1361.

[2] The entirety of Indian imports from South Africa, under HTS category 7201.1000, were of Sorelmetal. See id.

failed to place anything on the record of the review that indicated that Sorelmetal is different from the pig iron used by respondents." Def.'s Brief at 30.

The Court, in <u>Longkou</u>, concluded that Commerce failed to adequately explain whether the Indian imports under HTS 7201.1000 were the best available information for valuing the pig iron used by Plaintiffs. <u>See</u> 581 F. Supp. 2d at 1363. Therefore, the Court remanded the matter back to Commerce with instructions to specifically address (i) Plaintiffs' argument that Sorelmetal is fundamentally different from the pig iron consumed by respondents and cannot be used in the production of subject brake rotors; or alternately (ii) whether pig iron imports into India under HTS 7201.1000 are the best available information for valuing the pig iron consumed by Plaintiffs in the production of subject brake rotors. <u>See</u> <u>id.</u> at 1364.

The Department issued its draft results of redetermination on January 15, 2009. <u>See</u> Draft Results of Redetermination Pursuant to Court Remand.  Plaintiffs filed comments objecting to the draft results on January 22, 2009, and Commerce issued its Final Remand Redetermination on February 18, 2009.  <u>See</u> Letter From Trade Pacific Respondents (Jan. 22, 2008 [sic]) ("Draft Comments"); Final Remand Redetermination.  Consistent with the time parameters set forth on remand, Plaintiffs submitted their comments to the Final Remand Redetermination on March 20, 2009, and the Department filed

its response to those comments on May 8, 2009. See Plaintiffs'
Comments On Remand Redetermination (March 20, 2009) ("Final
Comments"); Defendant's Response to Plaintiffs' Comments Regarding
the Remand Redetermination (May 8, 2009). In the Final Remand
Redetermination, Commerce undertook a more extensive examination of
the record with regard to pig iron imports into India.  During the
course of the remand, Commerce re-evaluated the record evidence
with respect to the metallurgical properties of Sorelmetal,
concluding that Sorelmetal is a non-alloy pig iron and does not
possess any qualities that would fundamentally distinguish it from
the pig iron used in the production of subject brake rotors.  See
Final Remand Redetermination at 5.  Specifically, Commerce found
that the chemical composition of Sorelmetal is consistent with that
of the pig iron consumed by Plaintiffs in that they both contain
low concentrations of sulphur and phosphorous.  See id. at 6,8.
Therefore, Sorelmetal's low phosphorous content fits neatly into
HTS subheading 7201.1000, as a non-alloy pig iron with a
phosphorous content of less than or equal to 0.5 percent. See id.
at 8.  Accordingly, Commerce continued to rely on Indian HTS
category 7201.1000 as the best available information for valuing
pig iron imports into India. See id. at 4.

   The Department further concludes that "because Sorelmetal is
compared to steel scrap and other iron units, which record evidence
indicates are not ingredients used to make ductile iron," it can be

used for other types of castings than just ductile iron.  Id. at
13.  Moreover, the AUVs for those imports from South Africa, i.e.,
Sorelmetal, fall within the range of the other country-specific
AUVs under Indian HTS category 7201.1000. This, according to
Commerce, confirms that the Department's inclusion of Sorelmetal as
a surrogate value does not distort its normal value calculation for
respondent's consumption of pig iron.  See id. at 14-16.

By contrast, Plaintiffs, in their comments, have modified
their original stance as to the type of iron with which Sorelmetal
can be identified.  Originally, Plaintiffs argued that Sorelmetal
was "a high-purity[] ductile iron that is not used, and cannot be
used, to produce the subject merchandise."  Pls.' Brief at 25.
While now conceding that Sorelmetal is a high-purity pig iron,
Plaintiffs argue that their consumption of pig iron in the
manufacture of subject brake rotors is limited to the basic low-
purity pig iron traditionally used for such applications.  See
Final Comments at 3. According to Plaintiffs, Sorelmetal is a
higher value product with superior characteristics which allow its
manufacturer to charge a premium price.  See id. at 5.  This
premium price as applied to Plaintiffs' use of basic pig iron
distorts the normal value calculation of Commerce.  See id.
Therefore, Plaintiffs allege, Commerce's use of surrogate value
data comprised primarily of the specialty metal, Sorelmetal,
distorts its input valuation methodology.  See id. at 5.

In addition, Plaintiffs aver, Sorelmetal is a component used primarily, if not exclusively, in the production of ductile iron products. See id. at 2. Plaintiffs point to the fact that the sole application discussed on the Sorelmetal website is one in which Sorelmetal is used as an ingredient in the production of ductile iron, and charge that because the record is void of any "information [which] indicate[s] that Sorelmetal is intended for, or marketed for, use in non-ductile iron applications," Commerce's attempt to characterize it as interchangeable with basic pig iron is ill-conceived. Id. Moreover, Plaintiffs argue as incorrect, the Department's conclusion that Sorelmetal can be used for non-ductile iron applications because it is compared to steel scrap and other iron units not used in the production of ductile iron. See id. at 6. According to Plaintiffs, the record clearly demonstrates that ductile iron castings are "'made by mixing and melting together different grades of . . . steel scrap.'" Id. at 6 (citation omitted).

Lastly, Plaintiffs contend that the comparison of the sulfur content in Sorelmetal to that of the pig iron consumed by Plaintiffs is not an accurate barometer of whether Sorelmetal is specific to the pig iron used in the production of subject brake rotors. See id. at 7. The low concentrations of sulphur in both Sorelmetal and Plaintiffs' low-grade pig iron only tends to show that Plaintiffs' pig iron could conceivably be included in the

metallic charge used in the production of ductile iron, not that
Sorelmetal is used or could be used to produce subject merchandise.
See id. at 7-8.

### DISCUSSION

As noted above, because pricing information in a NME is
largely unreliable, section 1677b(c)(1) authorizes Commerce to
approximate the cost of production with pricing information from
surrogate countries and companies.  In calculating factors of
production, Commerce typically employs data sets for its analyses.
Judicial review of whether Commerce's data set selection is the
best available information addresses whether the particular
selection is supported by substantial evidence or otherwise in
accordance with law.  Whether a data selection issue is factual or
legal, i.e., reviewed for substantial evidence or for its
accordance with law, depends on the question presented.  See
Dorbest Ltd. v. United States, 30 CIT 1671, 1676, 462 F. Supp. 2d
1262, 1268 (2006).  For example, if the question is whether
Commerce may use a particular piece of data; may use a factor in
weighing the choice between two sets of data; or what weight may be
applied to such a factor, the question is legal.  See id.  If,
however, the question is whether Commerce should have used a
particular piece of data, or what weight should be assigned to
certain data, the question is factual.  See id.

In reviewing the factual issues of the case at bar, the Court

must consider whether Commerce's selection of Indian import data, comprised mostly of Sorelmetal, was appropriate. In so doing, the Court's role "is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006). While the statute is silent with regard to the definition of best available information, Commerce has been provided with "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Id. at 619, 431 F. Supp. 2d at 1327 (quoting Timken Co. v. United States, 25 CIT 939, 944, 166 F. Supp. 2d 608, 616 (2001)). Commerce's exercise of its discretion is not unfettered, however, and must still maintain fidelity to its statutory mandate of calculating dumping margins "as accurately as possible." Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994).

For the Court to conclude that a reasonable mind would support Commerce's selection of surrogate data as the best available information, Commerce must justify its selection with a reasoned explanation. See Dorbest, 30 CIT at 1677, 462 F. Supp. 2d 1262, 1269. Hence, if Commerce selects a particular set of data that is demonstrably unrepresentative or distortional, a reasonable mind may rightly question how such a selection could be considered the

"best."   While its choice may in fact be the best available information, affirming Commerce's decision requires a reasoned explanation that is supported by evidence on the record.

In addition to the statute, Commerce has promulgated regulations specifying that the information utilized is "normally" to be "publicly available" and that, except for labor, the Department will normally value all factors using data from a single surrogate country.[3]   19 C.F.R. § 351.408(c).   While Commerce has not promulgated additional regulations to govern its selection of data for the valuation of factors of production, it has adopted policy preferences relating to its data choices.   Specifically, Commerce prefers data that is (1) a non-export average value; (2) contemporaneous with the period being examined; (3) product-specific; and (4) tax exclusive.   <u>See</u> Issues and Decision Memorandum for the 2005-2006 Administrative and New Shipper Reviews of the Antidumping Duty Order on Brake Rotors From the People's

---

[3] 19 C.F.R. § 351.408(c)(1)-(2) reads in pertinent part:

(c) Valuation of Factors of Production. For purposes of valuing factors of production . . . under section 773(c)(1) of the Act the following rules will apply:

(1) Information used to value factors. The Secretary normally will use publicly available information to value factors . . . .

(2) Valuation in a single country. Except for labor, as provided in paragraph (d)(3) of this section, the Secretary normally will value all factors in a single surrogate country.

Republic of China at 6, cmt. 1 ("Issues and Decision Memorandum");

Notice of Final Determination of Sales at Less Than Fair Value:

Bicycles From the People's Republic of China, 61 Fed. Reg. 19,026,

19,030 (Dep't of Commerce April 30, 1996).

In the underlying administrative  review, application of the

factors outlined above led Commerce to rely on published values

from the WTA.  With regard to pig iron, Commerce selected HTS

category 7201.1000 as the product most similar to the reported type

of pig iron used by respondents.  See Issues and Decision

Memorandum at 6, cmt. 1.  While the Court, in Longkou, affirmed

Commerce's choice of WTA data as appropriate, the agency's

individual determinations, on a factor by factor basis, must also

be supported by substantial evidence.  If the Department's specific

data choices do not actually include or capture the factor or input

it is estimating, or a reasonably comparable item, such a choice is

not  supported  by  the  record.  Moreover,  if  the  data  is

disproportionately weighted by the inclusion of higher or lower

priced materials, such that Commerce is systematically overvaluing

or undervaluing the factors of production, a broad range of

statistics, such as those employed here would not, in and of

itself, render the data reliable.  See Goldlink Indus., 30 CIT at

629,  431 F. Supp. 2d 1323, 1334 ("Since the presumption is that

NME data is distorted, Commerce must find a reasonable surrogate

value.  Logically then, Commerce cannot use a surrogate value if it

is also distorted, otherwise defeating the purpose of using a surrogate value rather than the actual export value.").

The WTA data selected by Commerce represents the cumulative values for inputs classified under the Harmonized Tariff Schedule for the period of review.  See Preliminary Factor Valuation Memorandum at 2 (Feb. 9, 2007) (PR 179).  The Department classified each input based upon the factor-specific data submitted by respondents in their questionnaire and supplemental questionnaire responses. See Brake Rotors From the People's Republic of China: Preliminary Results of the 2005-2006 Administrative and New Shipper Reviews and Partial Rescission of the 2005-2006 Administrative Review, 72 Fed. Reg. 7,405, 7414 (Feb. 15, 2007) ("Preliminary Results").  For each input value, the Department used the AUV for that input as imported by India from all countries.[4]  See Preliminary Factor Valuation Memorandum at 2 (PR 179).  In its valuation of pig iron, the Department selected a surrogate value based on the AUVs of the 4,381 metric tons ("MT") of pig iron

---

[4] Import statistics from NME's (i.e., Armenia, Azerbaijan, Belarus, Georgia, Kyrgyz Republic, Moldova, People's Republic of China ("PRC"), Tajikistan, Turkmenistan, Ukraine, Uzbekistan, and Vietnam), countries with broadly available, non-industry specific export subsidies (i.e., Indonesia, South Korea, and Thailand), and undetermined countries were excluded from the calculation of the average unit value. See Preliminary Factor Valuation Memorandum at 2 (PR 179).

imported into India from seven different countries.[5]  See Issues
and Decision Memorandum at 2, 7, cmt. 1.  According to Commerce,
this surrogate value is consistent with its preference for
surrogate data that are (1) non-export average values; (2)
contemporaneous with the period being examined; (3) product-
specific; and (4) tax exclusive.  See id. at 6, cmt. 1.  For
purposes of the instant matter, the Court's analysis is confined to
the third of these factors.  Namely, whether the surrogate data
relied on is product-specific.

     Recognizing that a significant percentage of the pig iron
imports into India are comprised of Sorelmetal, Commerce maintains
that Sorelmetal "does not contain qualities that fundamentally
distinguish it from the pig iron used in the production of subject
brake rotors."  Final Remand Redetermination at 5.  In addition to
the similar chemical composition of respondent's pig iron and the
surrogate, the Department cites to the lack of any definitive
statement that "Sorelmetal is used only for ductile iron
applications," id. at 13, as a basis for its conclusion that
Sorelmetal "can be used in the production of subject merchandise,"
id. at 14.  While it may be true that record evidence does not

_____

     [5] The country-specific AUVs for each of the seven countries
are as follows: South Africa (19.85 Rs/kg), United States (45.00
Rs/kg), Malaysia (20.21 Rs/kg), Russia (16.59 Rs/kg), Germany
(16.00 Rs/kg), Egypt (14.57 Rs/kg), and Iran (11.96 Rs/kg). See
Issues and Decision Memorandum at 7, fn. 14, cmt. 1.

assign Sorelmetal any exclusive application, the record is
unmistakable as to its intended purpose.  For example, the
marketing materials included in the company's web page make clear
that Sorelmetal is a high-purity pig iron produced and marketed as
an ingredient in the manufacture of ductile iron. <u>See</u> Respondents'
Surrogate Value Submission for Final [Results], Exhibit 4 at 1
"More Metal For Your Money" (March 28, 2007) (PR 193) ("With
Sorelmetal, foundrymen can produce highly machinable Ductile Iron
castings."); <u>id.</u> at 2 ("Ductile Iron foundrymen report improved
physical properties . . . when Sorelmetal is included in the
metallic charge."); <u>id.</u> at 3 ("Sorelmetal Ductile Iron Castings are
ideal for a large diversity of applications."). On the other hand,
nothing in the record supports Plaintiffs' claim that Sorelmetal
commands a premium price as a result of its status as a high-purity
pig iron.  It is Plaintiffs' contention that because of the
enhanced physical properties of Sorelmetal, it logically follows
that these superior characteristics add to its cost.  Plaintiffs,
however, have failed to demonstrate factually how this conclusion
may be drawn.  The general assertions that "Sorelmetal costs more
than alternative iron inputs," or that "a foundry would pay a
premium for high-purity pig iron with exceptional dilution
qualities, such as Sorelmetal," fail to convince the Court of this
allegation.  Final Comments at 5. As Commerce points out, the AUV
for Sorelmetal is consistent with the imports of low-grade pig iron

from the other six countries.  In fact, Sorelmetal's AUV falls below the cumulative average of the other six countries.

Plaintiffs' alternate argument, that the absence of any "non-ductile iron applications" on the company's website is evidence of Sorelmetal's restricted use, is similarly flawed.  Id. at 2.  As mentioned previously, the manufacturer's marketing scheme clearly promotes Sorelmetal as a preferred ingredient in the production of ductile iron.  Yet, Plaintiffs acknowledge that Sorelmetal is a type of pig iron, which by its nature is a transitional product used almost exclusively as an ingredient in the mixture of higher grade iron castings.[6]  Therefore, its value is measured as such and is limited only by its ability to integrate with other forms of ferrous materials.  Here, the record lends support to Commerce's explanation that Sorelmetal possesses chemical properties that are consistent with other grades of pig iron used in the production of gray iron castings.  Plaintiffs' own evidentiary submission states:

> Gray iron castings are made of pig iron, of mixtures of pig iron and steel, or of mixtures of pig iron, steel and other metals in smaller amounts . . . the consensus of mold makers in this country indicates that the composition should be about as follows:
>
>     Silicon        1.25 to 1.75%
>     Phosphorous    0.120 to 0.140%
>     Sulphur        0.035 to 0.050%

---

[6] As the record demonstrates, iron "castings are made by mixing and melting together different grades of pig iron." Respondents' Surrogate Value Submission for Final [Results], Exhibit 3 at 1220 (PR 193).

       Manganese       0.75 to 1.25%

Respondents' Surrogate Value Submission for Final [Results], Exhibit 3, at 1226-27 (PR 193). Likewise, Sorelmetal is described as "containing very low concentrations of manganese, phosphorous, sulphur and other undesirable elements." Id. Exhibit 4 at 1 "A Better Product Means Better Results" (PR 193). These traits are consistent with the type of pig iron used in the manufacture of gray iron castings, the same material used in the production of subject merchandise. While the Court recognizes the lack of specificity with regard to Sorelmetal's chemical composition, Plaintiffs were free to develop the record as they saw fit, and have simply failed to provide any substantive information contradicting the Department's findings. The burden of creating an adequate record lies with respondents and not with Commerce. See NSK Ltd. v. United States, 20 CIT 361, 369, 919 F. Supp. 442, 449 (1996).

       Notwithstanding the fact that Sorelmetal may or may not be a perfect fit for the surrogate value calculation of pig iron, it is well established that "the process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise." Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (quoting Sigma Corp. v. United States, 117 F.3d 1401, 1407 (Fed. Cir. 1997)); see also Dorbest, 30 CIT at 1684, 462 F. Supp. 2d 1262, 1275 ("[T]he

estimation of a normal value using surrogate values is an inexact science."). Of course, a surrogate value must be as representative of the production process in the NME country as is practicable, if it is to achieve the statutory objective of assigning dumping margins as accurately as possible. This, however, does not mean that Commerce must duplicate the exact production experience of the NME manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of subject merchandise in a hypothetical market economy China. See Nation Ford, 166 F.3d at 1377 (quoting Nation Ford Chem. Co. v. United States, 21 CIT 1371, 1376, 985 F. Supp. 133, 137 (1997)). What constitutes the best available information concerning any particular factor of production will necessarily depend on the circumstances, including the relationship between the market structure of the surrogate country and a hypothetical free market structure of the NME producer under investigation. Simply put, the issue is whether Commerce acted reasonably when it included Sorelmetal in its estimation of the price and type of pig iron used in the manufacture of gray iron brake rotors in a theoretical market economy PRC. The Court finds that it did.

Here, Commerce has chosen, based upon Plaintiffs' own questionnaire responses, HTS category 7201.1000 as the product most similar to the reported type of pig iron used in the production of subject merchandise. The Indian imports selected by Commerce based

upon this HTS classification represent the types and prices of pig iron available to Indian producers of gray iron brake rotors. Plaintiffs have not pointed to any evidence of record which supports the contention that Sorelmetal cannot be used in the manufacture of these products, or that its inclusion in the calculation of normal value was distortional.  Without more it cannot be said that Commerce has failed to provide a reasoned explanation for its choice of surrogate data, or that a reasonable mind could not conclude that Commerce chose the best available information.

**CONCLUSION**

For the reasons set forth above the Court finds that Commerce's decision to use Sorelmetal as a surrogate value for pig iron in its normal value calculations is supported by substantial evidence and in accordance with law.  The Court therefore affirms Commerce's Final Remand Redetermination in its entirety.  Judgment to be entered accordingly.


                                        /s/ Nicholas Tsoucalas
                                       NICHOLAS TSOUCALAS
                                          SENIOR JUDGE



Dated: May 18, 2009
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Nicholas Tsoucalas, Senior Judge**

```
_____ :
                                         :
LONGKOU HAIMENG MACHINERY CO., LTD.,     :
LAIZHOU AUTO BRAKE EQUIPMENT COMPANY,    :
LAIZHOU HONGDA AUTO REPLACEMENT          :
PARTS CO., LTD.,                         :
LAIZHOU LUQI MACHINERY CO., LTD.,        :
QINGDAO GREN (GROUP) CO., and            :
LONGKOU TLC MACHINERY CO., LTD.,         :
                                         :
          Plaintiffs,                    :
                                         :
          v.                             : Consolidated
                                         : Court No. 07-00321
United States,                           :
                                         :
          Defendant,                     :
                                         :
          and                            :
                                         :
COALITION FOR THE PRESERVATION OF        :
AMERICAN BRAKE DRUM AND ROTOR            :
AFTERMARKET MANUFACTURERS,               :
                                         :
          Defendant-Intervenor.          :
_____ :
```

**<u>JUDGMENT</u>**

This Court, having received and reviewed the United States Department of Commerce, International Trade Administration's ("Commerce") Final Results of Redetermination Pursuant to Court Remand ("Final Remand Redetermination"), issued pursuant to the Court's order in <u>Longkou Haimeng Mach. Co., Ltd. v. United States</u>, 32 CIT __, 581 F. Supp. 2d 1344 (2008), Plaintiffs' comments and Commerce's response, holds that Commerce duly complied with the Court's remand order, and it is hereby

**ORDERED** that the Final Remand Redetermination, filed by Commerce on February 18, 2009, is affirmed in its entirety; and it is further

**ORDERED** that since all other issues have been decided, this case is dismissed.

**SO ORDERED**

_/s/ Nicholas Tsoucalas_
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated: May 18, 2009
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk